# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Tiffany Toth-Gray, et al.<br><br>Plaintiffs,<br><br>v.<br><br>LG&M Holdings, LLC et al.<br><br>Defendant. | Case No. 2:18-cv-02543-SRB<br><br>**Declaration of Robert L. Klein** |

I, Robert L. Klein, in accordance with the laws of the State of Arizona, declares under penalty of perjury, based upon my own personal knowledge in Middlesex County, Connecticut, that all of the following statements are true and correct to the best of my information and belief:

1. I am Chairman and Co-Founder of Applied Marketing Science, Inc. ("AMS"), a market research and consulting firm with offices in Waltham, Massachusetts.

2. I received a Bachelor of Science degree in Mechanical Engineering in 1966 from the Massachusetts Institute of Technology (MIT), in Cambridge, Massachusetts, and a Master of Science degree in 1968 from the MIT Sloan School of Management.

3. In my over 40-year market research career, I have personally designed and conducted over one thousand market research surveys. I am a member of the American Association for Public Opinion Research, the Product Development and Management Association,

1

and the Institute for Operations Research and Management Science. I have represented AMS on the Council of American Survey Research Organizations and to the International Trademark Association (INTA).

4. I have been retained by counsel for Defendant, LG&M Holdings, LLC (hereafter "Xplicit") in Glendale, Arizona, to serve as a rebuttal expert and as such, I was asked to review the report of Plaintiffs' survey expert, Martin Buncher, (hereafter the "Buncher Report") and his survey ("Buncher Survey") on which the Report is based.

5. I was asked by counsel for LG&M Holdings, LLC to review the report and the accompanying data to determine if it could be used to support any of the allegations of the Models in this matter.

6. I prepared a Report dated January 7, 2020 ("Klein Report"), a copy of which is attached hereto as Exhibit "B". I stand by the Klein Report and incorporate all of the contents therein by reference. The Klein Report explains why the Buncher Survey and Report are fundamentally flawed, lack probative value and should not be considered as evidence of consumer confusion. The Klein Report contains greater specificity regarding my credentials for rendering my opinions, which I incorporate into this Declaration.

7. The Buncher Report purports to measure possible confusion among consumers who were exposed to the Images at issue to determine what they understood about the models' appearances in the material.

8. I have reviewed the January 3, 2019 decision in Toth v. 59 Murray Enterprises et al., Case 1:15-cv-08028-NRB, SDNY ("Toth Decision"). I also reviewed the March 30, 2020 decision in *Edmondson et al. v. RCI Hospitality Holdings et al.* 16-cv2242. As I explain herein, most of the fundamental flaws identified in the *Toth* and *Edmondson*

    Decisions with Mr. Buncher's work in that case are present and have not been cured with respect to the Buncher Survey and Report presented in this case.

9. The Buncher Report and Survey are fundamentally and fatally flawed and of no probative value. Specific flaws in the Buncher Survey include:
    - The use of an unrepresentative sample
    - Leading questions
    - Questions that make unverified assumptions
    - Questions that pose unrealistic hypotheticals
    - The absence of any caution or instruction to respondents not to guess
    - No option for respondents to answer "don't know" or "no opinion," and,
    - Most importantly, the lack of any control group.

10. <u>Buncher's failure to use a control group is significant.</u> The most significant flaw in the Buncher Report is the lack of any means of accounting for guessing, prior beliefs, bias, yea-saying and any other form of survey "noise." "Controls play a central role in enabling a survey to rule out threats to valid causal inference."[1] "Today, most courts will reject or give little weight to surveys that have no control group to account for consumers' preexisting beliefs."[2]

11. The Buncher Report maintains that no control was necessary or appropriate because the Buncher Survey was a "communications study" and not a "causal study." The Buncher Report goes on to state that "As the purpose of this research is not the test of a causal proposition, but rather a communications or descriptive study, there is no need for a control group." But as Professor Diamond states "causation is an unambiguous requirement"[3] in a Lanham Act case.

12. First it must be noted that the Buncher Survey was, in fact, specifically designed to be a causal study. As stated in the Study Design section of the Buncher Report: "the survey

---

[1] Diamond, Shari Seidman & Swann, Jerre B.eds, Trademark and Deceptive Advertising Surveys, Law, Science, and Design, p. 216
[2] *Ibid.*, p.183, (footnote to this sentence lists a dozen cases where surveys were excluded due to the lack of a control.)
3Diamond and Swann supra p 201

3

was designed to measure the degree of confusion which may have been created by the use of eight *[sic]* women ,,, in the Internet advertising of the Explicit *[sic]* Gentleman's Club…" This sentence directly posits a causal relationship between the "use of women in the advertising" and "the degree of confusion…created by" that use.

13. Labeling the Buncher Survey as a "communications study" does not relieve the researcher of the responsibility of accounting for all the forms of survey noise previously identified. In order to properly "document only what the advertising alone conveyed" (which the Buncher Report claimed was the objective) there must be a means to separate what is communicated by the "advertising alone" and what a survey respondent may have believed before taking the survey. The Buncher Report fails because it does not make any legitimate attempt to account for any form of potential bias.

14. Second, when considering surveys related to false advertising (which is certainly the realm of the Buncher Survey), controls are virtually required. "By adding an appropriate control group, the survey expert can test directly the influence of the allegedly actionable stimulus. The failure to use a control group, or otherwise show there is no need for one, can be fatal."[4]

15. The Buncher Report acknowledges the need for controls but laments the difficulty of creating one. It was, however, the structure chosen by Buncher for his survey that caused that difficulty. This does not mean that there was no need to account for pre-existing beliefs, yea-saying, guessing and other forms of survey noise in the interpretation of survey responses. By dismissing or disregarding the existence of survey noise, the Buncher Report fails to provide any useful information or any legitimate support for the opinions expressed.

---

[4] Keller, Bruce P. "Survey Evidence in False Advertising Cases" in Diamond & Swann supra, p. 182

16. The use of a control group is analogous to the use of a placebo in the test of, say, a new drug. To test a new drug, some patients are given the test product, and some are given a placebo or sugar pill or some other drug with a known efficacy. Patients are randomly assigned to receive either the test product or the control. The effect of the drug is measured by the difference in response between those receiving the test drug (the "test" group) and those receiving the placebo (the "control" group.) The use of a control in the drug testing situation is important because some people will get well even with no treatment at all and some get well just because they think their disease is being treated.
17. The critical measure in a test-control design is the difference in response between the test and control groups. But in the Buncher Survey there is no way of distinguishing the true beliefs of the survey participants from random guessing.
18. The Buncher Survey contains leading questions that improperly provide the respondents with cues for their answer.
19. The complete reliance on closed-ended questions to support the opinions of the Buncher Report absolutely requires some means to at least account for guessing.
20. As just one example, how many respondents were "just guessing" when they claimed to have recognized the women in the pictures despite having given no indication whatsoever of any recognition in their initial open-ended and unprompted responses to the pictures? (Buncher Report, Exhibit 7). "Although not applicable to most consumer surveys in marketing, advertising, and other domains, when it comes to surveys being proffered as evident in litigation matters, answers that are guesses are not considered probative."[5]
21. Moreover, "if the respondent has not previously been informed that 'don't know' is an acceptable answer, or a 'don't know' response option is not provided as part of the

---

[5] Jacoby in Diamond & Swann supra, p. 273

question, then the question likely is a leading question because it leads the respondent away from answering 'don't know' and toward selecting one of the provided options."[6] This is simply another example of the way in which respondents are encouraged (or even required) to guess.

22. The Buncher Report attempts to justify the omission of a "don't know" option by reference to an article by Peabody, ('Two Components in Bipolar Scales: 'Direction and Extremeness', *Psychological Review*. 69(2): 65–73) and a college textbook by Rossiter and Percy (Rossiter, J.R. and Percy, L. (1997) *Advertising Communications and Promotion Management*, 2nd Edition, New York: McGraw- Hill). The Buncher Report states that these researchers have found that including "don't know/no answer" as a response option increases "error variance in the data."[7] It must first be noted that both references predate the use of the internet for survey research (the first by almost 50 years) and neither makes any reference to the use of survey research in litigation. But more importantly, and <u>contrary</u> to the Buncher Report's assertion, neither reference includes anything at all about the effect of including a "don't know" option in questionnaire design.

23. "Yea-saying" is another form of bias that is a particular problem for yes/no questions. The reason a question that may be answered by a mere "yes" or "no" is likely to provide biased answers is that, all other things being equal, respondents – generally, agreeable people who have agreed to participate in the first place – are more inclined to be agreeable and answer "yes" than to answer "no".[8] Unless the bias is accounted for or

---

[6] Jacoby in Diamond & Swann supra , p. 274
[7] Buncher Report supra, p. 16
[8] Jacoby in Diamond & Swann supra , p. 274. A footnote to this statement references Jon A. Krosnick, *Survey Research*, 50 Annual Rev. Psychol. 537-68 at 522: "[e]vidence of acquiescence [i.e., yea-saying bias] is voluminous and consistently compelling…"

controlled, the resulting data is unreliable and cannot be used as a basis for expert opinion.

24. The Buncher Report's use of a "control question" is no such thing and in no way resembles the way Professor Diamond discusses the concept. The Buncher Report misquotes a portion of the Diamond article and omits the example she provides that bears no resemblance whatsoever to the part of the Buncher Survey that he claims implements the concept of a control question. Buncher claiming to quote Diamond[9] included this quotation (sic) from the Reference Manual on Scientific Evidence, 3rd Edition, 2011:

> Another more common use of control methodology is a control question. Rather than administering a control stimulus to a separate group of respondents, the survey asks all respondents one or more control questions along with the question about the product or service.

The actual complete quotation is:

> A less common use of control methodology is a control question. Rather than administering a control stimulus to a separate group of respondents, the survey asks all respondents one or more control questions along with the question about the product or service at issue. In a trademark dispute, for example, a survey indicated that 7.2% of respondents believed that "The Mart" and "K-Mart" were owned by the same individuals. The court found no likelihood of confusion based on survey evidence that 5.7% of the respondents also thought that "The Mart" and "King's Department Store" were owned by the same source.

Note that the portion of the quotation provided in the Buncher Report changes Diamond's description of a control question from "less common" to "more common."

25. The single question in the Buncher Survey that includes what the Buncher Report claims is a "control question" bears no resemblance to the example described by Diamond. The Buncher Report contention that showing a respondent two pictures side by side and

---

[9]The Buncher Survey lists the reference as being from page 252 in Sheri S. Diamond, Reference Guide on Survey Research, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 359 Federal Judicial Center 3rd ed. 2011. The correct page number is 401.

asking a single closed-ended question (without a "don't know" or "no preference" option) could somehow account for all pre-existing beliefs, guessing, yea-saying and all other forms of survey noise in all the other data collected is both contrary to the concept of a control question and absurd on its face.

26. <u>Buncher's Survey did not use an appropriate sample</u>. The appropriate respondents for a study of what is communicated by advertising for a Gentleman's Club are the potential patrons of such a club. Although the Study Design section of the Buncher Report refers to "potential consumers who might be interested in what was being promoted,"[10] the Buncher Survey did not attempt to focus on these individuals or screen to make sure that only such people would be included in the survey. As a result, only 93 of the 606 survey respondents claimed to have been to a Bikini Bar/Gentleman's Club/Strip Club in the past two years. Of these, 53 (38 men and 15 women) saw the first group of three ads and 40 (28 men and 12 women) saw the second group of three ads. These sample sizes are woefully inadequate for drawing any statistically reliable conclusions regarding what was communicated by the images shown. The inadequacy of the sample sizes is confirmed by the reference cited by the Buncher Report (Rossiter, J.R. and Percy, L. (1997) *Advertising Communications and Promotion Management*, 2nd Edition, New York: McGraw- Hill) which in the section on ad testing states "The first rule is that each respondent should be shown only one test ad"[11] and that "A normal minimum would be 100 per cell."[12] The Buncher Survey tested 3 "ads" at a time with 53 relevant respondents in one cell and 40 in the second.

---

[10] Buncher Report supra p. 6
[11] Rossiter, J.R. and Percy, L. (1997) *Advertising Communications and Promotion Management*, 2nd Edition, New York: McGraw- Hill, p. 556
[12] *Ibid*., p. 557

8

27. Additionally, the Buncher Survey included a quota for men and women that resulted in approximately half the sample being women. I have been informed that women make up only 5% of the customers at Xplicit. This means that even this tiny sample was not representative of the customers of Xplicit, and the Buncher Report makes no attempt to weight or otherwise adjust the results to reflect the actual gender makeup at Xplicit. And since women are an insignificant fraction of the customer base for Xplicit, the only relevant responses are from the 38 men in cell 1 and the 28 men in cell 2.

28. Forgetting all the other flaws in the Buncher Survey, these sample sizes are clearly inadequate to support any opinion about what was communicated by the images shown.

29. There was no inclusion in the Buncher Report of any specific information related to the email invitation process or the compensation paid to respondents who complete the survey. Depending on how the email invitation was phrased, respondents could have been alerted to the theme of the survey and what answers would qualify them for the survey.

30. Nor was there any indication of the how much cash respondents would receive for their participation. A large cash incentive could encourage potential respondents to try to answer in a way that would qualify them for the survey. And little or no compensation would result in a sample of respondents with nothing better to do than complete on-line surveys. In either case, the result would be an unrepresentative sample of the relevant population.

31. <u>Choice and grouping of the "ads" shown</u>. Mr. Buncher was provided by counsel for the Models with 54 screen shots of Facebook or Instagram pages (identified variously as Exhibit 1 or Exhibit 3B to the Buncher Report) which allegedly contain pictures of the plaintiff Models. From these 54, he chose 6 to include in the survey. Cell 1 of the Buncher Survey included, allegedly, Mitcheson, Longoria and Davalos. Cell 2 included,

allegedly, Iglesias, Cheri and Gray. The Buncher Report is silent on how the 6 images were chosen, how the decision of which Models to group together were made, and what effect a different selection or grouping would have made.

32. Buncher Survey encouraged guessing. At no point in the Buncher Survey were respondents instructed not to guess or told what to do if they didn't have an answer for a question, were unsure or simply did not have an opinion. By not providing these standard instructions and not providing respondents with an option of answering "don't know" or "no opinion," the Buncher Survey encouraged guessing.[13] But as described above, without a Control Group, there is no way of determining which answers are just guesses.

33. The introduction to the survey (to determine the "importance of women as they appear in internet advertising") clearly communicates the purpose of the survey and introduces a demand effect that biases the responses that follow because the survey is no longer double-blind.[14] When respondents are informed from the outset of the purpose of a survey or how the results would be used, bias is introduced, and the results become unreliable.[15] This is particularly true when there is no control group.

34. Questions were leading, biased, poorly worded and made unsupported assumptions. Almost every question in the Buncher Survey is flawed. To begin with, constantly referring to the pictures shown as "ads" as opposed to "social media posts" or just "pictures" biases the responses by ignoring marketplace realities and triggering any pre-existing associations and assumptions that a survey respondent may have about individuals appearing in "advertising" as opposed to social media posts. The Buncher

---

[13] Diamond, Shari Seidman, "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence, 3rd Edition,* Federal Judicial Center, p. 389-391

[14] *Ibid,* p. 411, "Both the interviewer and the respondent are blind to the sponsor of the survey and its purpose. Thus, the survey instrument should provide no explicit or implicit clues about the sponsorship of the survey or the expected responses."

[15] Diamond and Swann supra p.246

10

Survey makes no attempt to account or for these biases, rendering the data collected useless.

35. The following is a leading question that makes the assumption the role of the models in the images was to initially attract attention to the "ad," but the question makes no sense in the context of the survey:

> Q4. Looking specifically at the women in these ads, how important, if at all, do you feel they are or were in terms of <u>initially</u> attracting your attention to the ads?

Survey respondents are directed to look at the "ad" - exposure to the ad was forced so there was no "initial attracting" that took place. There is no way of knowing how respondents were really interpreting the question, but this flawed wording further alerts the respondent to the purpose of all the questions that follow.

36. Question 8 is more seriously flawed:

> Q8: Considering that these are actually real women shown in the ads and not just fictitious drawings, please indicate using your strangest [*sic*] impression for each pair of opposing statements, the one you think is true based on your personal feelings. Remember, we want your response based only on these ads you are seeing, and nothing else you might have seen or heard previously.

The text of the Buncher Report indicates that the instruction for Question 8 was supposed to have asked respondents to answer "using your strongest impression for each pair of opposing statements…" Importantly, however, the actual wording seen by respondents (as shown in the screen shots in Exhibit 4 to the Buncher Report) was "using your strangest impression for each pair of opposing statements…" Substituting "strangest" for "strongest" certainly changes, and likely reverses, the meaning of the question. There is no way of knowing whether respondents used their "strangest" or "strongest" impression when choosing one

11

from each of the pairs of statements which renders all the answers to this set of questions unreliable.

37. 12 of the 93 prior Gentlemen's Club customers (9 of 66 men and 3 of 27 women) reported that they had, in fact, "patronized" the specific club identified in the images shown. The respondents' attendance at this club would likely cause them to form opinions (either positive or negative) that would influence their answers to the questions in the survey, and knowing these prior opinions is critical to interpreting their responses. Instructing them to (somehow) forget those opinions renders their answers to the entire question sequence unreliable.  Moreover, the lack of a "don't know" option forces respondents to guess when they may have no way of knowing the truth of either statement.

38. The specific statements themselves are each flawed. Each pair of statements begins with the phrase "All of the women …" With this wording, the respondent is faced with the choice of all or nothing. There is no way to indicate a belief that "some" may have the particular trait being queried. And, there is no way for the respondent to indicate that he or she is unsure whether <u>all</u> do one thing or another.

39. Example of a flawed statement:
    - All the women shown probably enjoy a lifestyle like that reflected in Gentlemen's Club ads
    - All the women shown probably do not enjoy a lifestyle like that reflected in these Gentlemen's Club ads

    This is the first occurrence of the word "lifestyle" in the survey and no definition is supplied. The word "enjoy" has multiple definitions: it could mean "derive enjoyment" or it could mean "participate in".  There is no way of knowing what they thought "enjoy a lifestyle" referred to. And the use of "probably" invites guessing

40. Another example of a flawed statement:

- All the women in these ads probably do participate in the events or activities which take place in the club, and as reflected in the ads in which they appear
- All the women in these ads probably do not participate in the events or activities which take place in the club, and as reflected in the ads in which they appear

In this poorly worded question. "Probably" implies some level of probability, but "all" means all or nothing. And the phrase "and as reflected in the ads in which they appear" is grammatically incorrect. A respondent reading carefully would likely be confused about the question and forced to guess at an answer. And not all the images are related to "events or activities" again forcing respondents to guess.

41. Another example of a flawed statement:
    - All of the women were paid to be in the ads in which they appear
    - All of the women were not paid to be in the ads in which they appear

Once again, the reference to the pictures as "ads" creates bias due to any beliefs that survey respondents may have about how people appearing in advertisements are compensated compared to social media posts.

42. Another example of a flawed question:

    "How likely do you think it is that this Club is using all these women shown in the ads to make you think they represent the same kind of women you would expect to see performing in some way at the club represented?"

What is the relevance of what the survey respondents think is the Club's motivation for using the photos? The respondents certainly have no way of knowing why the Clubs are using these models. And, in as much as these 93 participants in the survey claim to have been to a strip club in the past 2 years, they probably have a pre-conceived notion of the kind of women they would see.

43. The verbatim responses (Exhibit 7) are not consistent with the closed-ended questions. Question 5 asks "What do you feel these ads are trying to communicate to you?" Of the

13

93 respondents to the survey who had been to a Bikini Bar/Gentleman's Club/Strip club, only 4 responded in a way that could possibly be interpreted as believing that the actual models in the images might be appearing at the club. The answers of these 4 respondents to this question shown in the Klein Report at p. 15.

44. The Buncher Survey contained unrealistic hypothetical questions. Respondents were shown one of the "ads" next to a digitally edited version of the ad with the woman (or women) removed. Above the images were the words, "Here again is one of the ads you have just seen, along with the same ad, but without the woman in it." The images were labeled "With the woman/women" and "Without the woman/women." This was followed by the question "As you look at these two ads, which one do you feel would be more likely to interest you in considering the possibility of visiting the club? In your answer, please assume the final quality of the new photo-shopped version would be comparable to that of the original." There were two response options: The ads with the woman/women, and the ads without the woman/women.

45. This specific question is what the Buncher Report claims is a "control question" that will account for guessing, yea-saying, prior information, and all other forms of survey noise. As previously noted, it is no such thing. The Buncher Report does not use the answers to this question as a factor for making adjustments to any of the other answers in the survey. Moreover, the images "without the women" are not realistic social media posts. The specific image shown in Cell 2 "without the woman" is a picture of an empty room with no text to identify the club. In effect, respondents were asked to forget the "ads" they had just seen and all the questions about the women in the "ads" that had preceded this question.

14

46. This was followed by an even more unrealistic hypothetical and confusing question and instructions.

   > Suppose you knew nothing about this club, but you had seen some advertising promoting events there, some with the woman/women in the ads, and some without the woman/women. To what extent, if any, would you say the ad with the women in it versus the ad without her would affect your interest in attending one of the events.
   >
   > Please indicate what percentage increase that might be, if any ranging from 0% to 100%, or anywhere in between. A response of "0%" indicates you feel the ads **with the woman/women** would not be any more likely at all to affect your interest in attending the club that the same ad **without her.**
   >
   > Any other percentage indicates you feel that having the women in the ads was responsible to some degree in affecting the interest you would have in attending the club, all the way to 100% indicating you feel they were totally responsible.

   This hypothetical makes no sense in the context of the pictures that were shown or the likely prevalence of other promotion for this club.

47. First, 93 of the respondents taking the survey claim to have been to a gentlemen's club (including some who answered that they had been to Xplicit) in the past 2 years. Instructing them to "know nothing" is absurd and impossible. And, as previously noted, some but not all of the images reference an actual "event" at the club. Still, respondents are asked to imagine an "ad" for an "event" and then imagine seeing the images from the survey.

48. Further, the scale (0% to 100%) the respondents were instructed to use in their response makes little sense as there is no baseline for measuring their prior interest in patronizing the clubs, and the images without the women would never be used. For example, what if they already had some interest in going to the club? What if they had previously gone to

the club and had no interest in returning? Each of these scenarios affects the meaning of the response, but there is no way of knowing what the respondents were thinking when they answered the question.

49. <u>There is no way to know if the models were recognized</u>. I reviewed the open-end responses to the questions that followed the initial exposure to the images. <u>None</u> of the open-end responses indicated <u>any</u> recognition of the women in the images. There was a single question near the end of the survey that asked if they "recognized the female or females shown in the ad." This was a "yes" or "no" question with no option to indicate uncertainty. And there was no follow-up question to determine where or how they recognized the "female" or who they thought she was. Lacking any kind of control or other means of assessing the extent of guessing, there is no reasonable basis to conclude that respondents recognized <u>any</u> of the women in the images.

50. If there is little or no recognition of an individual pictured in an image, there can be no claim that "a significant number of customers would be confused or deceived into buying the goods or services because that person has endorsed the defendant's product or service."[16]

51. <u>Prior exposure to the advertisements was not accounted for.</u> The Buncher Survey did not make any attempt to control or account for prior exposure to the club identified in the images. As previously noted, only 93 respondents answered that they had been to a gentlemen's club in the past two years, and 12 (9 men and 3 women) reported having been to Xplicit.

52. The Buncher Survey did not ask if respondents had previously seen the postings shown or other postings for or by Xplicit. There was no attempt to separate the response of those

---

[16] McCarthy, J. Thomas, *The Rights of Publicity and Privacy*, 2nd Edition, §5:33

16

who had previously seen an image from those seeing an image for the first time. Controlling for and accounting for prior knowledge of the Club and its advertising is one function of the missing control group. Without such analysis, no conclusion can be drawn about the effect of the pictures of the women in the stimuli used.

53. <u>The Buncher Report contains a number of inaccuracies.</u> "The completeness of the survey report is one indicator of the trustworthiness of the survey and the professionalism of the expert who is presenting the results of the survey."[17] And in describing in detail what a survey report should include Diamond lists: "The exact wording of the questions used, including a copy of each version of the actual questionnaire, interviewer instructions, and visual exhibits."[18]

54. As previously noted, the actual wording of the instructions for Question 8 that each survey respondent saw appears to ask the opposite of what the Buncher Report indicates was the desired question. Similarly, the question showing two images side-by side, one with the model and one without, makes reference to the "ad with the women" and the "ad without the women." Use of the plural when only one woman is shown must be confusing to a survey respondent who is paying attention to the question asked.

55. In several places, Mr. Buncher himself seems to be confused about the facts of the case and what he did. In the section that describes the study design, the Buncher Report states "The survey was designed to measure the degree of confusion which may have been created by the use of eight [*sic*] women (as presented in the Complaints) in the Internet advertising of the Explicit [*sic*] Gentleman's Club…"[19]

---

[17] Diamond, *supra* at 415.
[18] *Ibid.*
[19] Buncher Report supra p. 6

56. And in section "6. Conclusions" he states "The data generated in this research clearly indicate that all seven [*sic*] of the women appearing in these Clubs [*sic*] ads…"[20] There were, however, only six women plaintiffs and the name of the club is "Xplicit Showclub." At later points in the report, he again refers to "Explicit Club," but also states that specific survey respondents "were significantly more often motivated to patronize Dandy Dan's"[21] and referred to "images tested as they were used in the Saturday Night Club ads."[22] These errors may be the remnants of prior similar reports, but their presence here, along with other typographical and grammatical errors calls to mind the Diamond statement above about the professionalism of the expert.

57. <u>A prior, similar Buncher survey has been stricken.</u> The Buncher Report attempts to bolster the validity and reliability of its conclusions by making reference to "a major series of studies completed in 2017, 2018 and 2019, highly similar and sometimes identical to the design and questionnaire of this study." The report states that the "results of this study focusing on advertising for these Clubs [sic] closely matches the pattern of data recently found in over 35 other studies involving many similar Clubs in the bikini bar/Gentlemen's Club/Strip Club industry, including Club locations ranging from the East to West Coast of the U.S.."[23] The Buncher Report goes on to state that this current survey is "comparable to those previous studies based on identical objectives" and "using either identical or similar questions."

58. The Buncher Report neglects to note that one of these "other studies" was for a recent case (Tiffany Toth et al. v 59 Murray Enterprises et al., Case 1:15-cv- 08028-NRB, SD of

---

[20] *Ibid.* p. 24
[21] *Ibid.* p. 23
[22] *Ibid.* p. 24
[23] Buncher supra p. 7

New York) in which the court, after citing many of the same flaws identified in this report ruled:

> Because the Buncher Survey is methodologically flawed and not probative of the relevant issues, we grant defendants' motion to strike the report, survey, and testimony of Martin Buncher.

That this same flawed survey has produced comparable results demonstrates the significance of the flaws rather than the validity of the results.

Dated and executed this 14th day of May, 2020.

*Robert L. Klein*
_____

Robert L. Klein